IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

BANCORPSOUTH BANK,

     Plaintiff,

v.                                 No. 04-2420 B

JUSTIN HERTER and CAPITOL MANAGEMENT, INC.,

     Defendants.

_____

MEMORANDUM OPINION
_____

INTRODUCTION

This action, filed in June 2004, arises from a series of defaulted mortgage loans made by the

Plaintiff, BancorpSouth Bank (sometimes referred to herein as "BancorpSouth" or the "Bank") to

certain family members of the individual Defendant, Justin Herter.  The Plaintiff has alleged that

these family members, who have been dismissed as Defendants in this case, were "straw borrowers"

for Herter and Defendant Capitol Management, Inc. ("CM") and that Herter and CM should be held

jointly and severally liable for the defaulted loans.  The Court tried this civil action without a jury

commencing on March 3, 2008.  Following the trial, the parties filed proposed findings of fact and

conclusions of law.  Rule 52 of the Federal Rules of Civil Procedure requires that, "[i]n an action

tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions

of law separately."  Fed. R. Civ. P. 52(a)(1).  In accordance with the Rule, the Court finds and states

the following.

FINDINGS OF FACT

The loans at issue in this case were taken out in the names of Robert and Janet Powell,

Herter's grandparents, and Sylvestre Loera, his uncle, and secured by various residential investment properties in Memphis, Tennessee. Some of the loan documents were signed by Herter, a Memphis, Tennessee resident, as attorney-in-fact for his family members, who lived in Texas and Ohio. Herter was the person who dealt with BancorpSouth during the loan process.

He had approached his grandparents, who lived in Lorain, Ohio, with a business proposition, hoping that they would assist him in starting a business. He told them that, if they would provide their credit, he would be able to purchase homes, make improvements and rent them out. In exchange, Herter promised to give the Powells a certain amount of money over time. They assented. Janet Powell, who at the time of her deposition was approximately seventy-one-years-old, testified that they were to receive $1,500 per house. Herter also agreed to pay off the mortgage on their home in Ohio. The Powells understood that Justin intended to use their credit in order to maintain loans to purchase houses. Robert and Janet Powell signed powers of attorney giving Justin the ability to sign in their stead for the house loans.

In his deposition, seventy-seven-year-old Robert Powell advised that his memory was "not like it used to be" but recalled that he and his wife made the initial start-up loan for Herter's business venture and were some of the first to receive houses. Powell stated that

> my understanding was that [Herter] would purchase the houses, he would fix them up, he would rent them, he would pay all the taxes, he would pay all the rent and everything, but he would rent them out and all I was supposed to get was so much for each house that he sold -- I mean, that he bought and rented out. And we set it up where we could get so much a month and he said he would be paying us the rest of our lives, so we set it up where we'd get so much a month for -- for a lifetime, and that's the whole idea. To us, it was nothing. Justin was -- Justin was going to do it all. He was going to do everything. All we had to do is just sit back and -- after we signed the houses and he would pay us.

(Oral and Videotaped Dep. of Robert O. Powell, Sr. ("Powell Dep.") at 5-6.) Powell had finished

the eighth grade and had no prior experience with real estate or bank loans beyond selling his own home. Powell related that he "would get [loan documents] and take them down to the bank and get them notarized and . . . fax them . . . back to [Herter] and . . . put [his] initials on the papers." (Powell Dep. at 7.) He acknowledged that neither he nor his wife read the documents. Powell insisted that he "thought everything was going through Justin" and was unaware he "was obligated to do anything. He [(Herter)] was making all the payments and all the taxes, everything else." (Powell Dep. at 8.) Justin never told Powell that he was not obligated on any of the loans and he understood the houses were to be in his name. He did not know how many loans or houses were in his name. It was Powell's impression that he was lending Herter his name and credit and that the individual Defendant would "take care of everything." (Powell Dep. at 8.) Powell did not believe he and his wife were responsible for the loans "in reality" because they thought Herter "was going to do the right thing and make the payments and -- until everything was settled." (Powell Dep. at 8-9.) Powell described himself as "just a figurehead." From time to time, the Powells' daughter and Herter's aunt, Betty Dolores Loera, was in Ohio and would advise her parents on the documents sent to them for execution.

 With respect to CM, Powell offered the following testimony:

Q: Okay. Did you understand -- what was your understanding of your involvement with [CM]?

A: All I understand was it was a loan in my name so he could buy houses and rent them out and we'd get money in exchange for that. That's it, the whole understanding I was in.

Q: Okay. Did you -- do you know what a corporation is?

A: A corporation is like a company, isn't it?

Q: All right. A company. Were you involved with -- with any --

A:     I think they had my name down as a minute man or something.

Q:     Okay.  Was that with your understanding?

A:     That was my understanding.  It was a -- I laughed at it.  It was a joke to me. I never sat on a meeting.  I never done anything.

Q:     Okay.  So, I mean, when you say minute man, when I'm looking at documents  that --

A:     I was supposed to take the minutes.

Q:     You were actually elected as an -- as the office of secretary of a corporation. That's a joke to you?

A:     It -- well, I'm in Ohio and he's in Tennessee, and I'm supposed to be sitting in on meetings?

(Powell Dep. at 12-13.)

Janet Powell recalled in her deposition that employees at Lorain State Bank told her and her husband when they signed the documents that Justin "could really screw" them but they did so anyway because they loved him.  He was her favorite grandson.  According to their testimony, the Powells knew what they were doing when they signed the loan documents, but did not "in reality" believe they would be responsible for repayment, not because they were ignorant but because they trusted Justin to repay the loans.  Mrs. Powell acknowledged that Justin was using their credit with her permission.  Only later did she decide he had misused it.

The Powells and Loera did not make investigation of the loan transactions because they chose not to.  The following testimony was taken in Mr. Powell's deposition:

Q:     . . . Now, you understood if, for whatever reason, Justin didn't pay the note on these houses, that you would ultimately be responsible?

A:     Well, I didn't think it was going to happen.  That is -- that is --

Q:     Well, you understood that it could happen?

4

A:      Yeah, it could have happened.  It did happen.

(Powell Dep. at 19-20.)

Betty Loera, aged fifty-two, and her sixty-six-year-old husband Sylvestre, lived in Weslaco, Texas.  According to Ms. Loera, Herter approached the Powells first about using their credit and then the Loeras when he realized he would need more collateral.  She reached an agreement with him to be paid $1,000 per signature until he started making a profit, at which point the payment to the Loeras was to increase to $10,000 per year.  Ms. Loera was comfortable with the arrangement, testifying in her deposition that

> [h]er family has always been in real estate; my grandfather, other family members, my uncles on my mother's side.  We've always been in the business of fixing up homes.  My husband and I even tried it, where we would buy homes, fix them up, rent them and sell them for a profit, and so -- on a small scale basis.  I think my grandfather, before he died at the age of [ninety-two], he had done [one hundred] houses.  They praised him in a newspaper for it.  So we had a background, to a small degree, and so when Justin approached us with it, it sounded reasonable because this is what we thought that he was going to do.

(Oral and Videotaped Deposition of Betty Dolores Loera ("Betty Loera Dep.") at 9.)  She viewed it as a "family" business and thought Justin would always take care of them.  The Loeras and Powells also agreed to be involved in CM in name only.

Ms. Loera explained that, in the beginning when she lived in Ohio, her parents would bring documents they received from Herter to her so that she could review them before they were signed and notarized at the bank by the Powells.  Loera insisted that she, her husband and parents acquiesced to the terms of the agreements they signed and that they understood the risks involved in making real estate investments.  They further understood Herter was putting up none of his own credit or collateral.  She recalled that Herter told them on numerous occasions that they could potentially lose their money.  Ms. Loera admitted that, at times, there were so many documents that

5

they sometimes signed them without reading them in their entirety.

Both the Powells and the Loeras were also aware that the houses purchased with the loan documents they signed would be in their names but that the loans would be repaid by Justin Herter. It was his relatives' understanding that they would provide their credit and signatures on the loan documents in order to obtain the loans and that Justin would, along with making the loan payments, pay taxes and maintain the purchased properties. All they were required to do was sign documents and be paid by Justin. Sylvestre Loera stated in his deposition, however, that he was unaware the papers he signed provided that he was to repay the loans. Nonetheless, he knew that, pursuant to the documents, deeds to houses in Memphis, Tennessee were being issued in his name and he was the record owner "in a way." Loera made no independent investigation of the transactions, but relied on Justin and Ms. Loera. According to his wife's testimony, Mr. Loera was of Mexican descent and had an education level equivalent to junior high school in the United States.

Ms. Loera related that,

[t]he family believed that we were in real estate. We were like backers. In other words, we were loaning our credit -- and in my mom and dad's case, their monies, -- so that we would be able to make money, and Justin was supposed to take care of everything. So because of it being in Tennessee and us, obviously, in Ohio and in Texas, we couldn't very well oversee any of the everyday operations, so he had set up a [CM] mortgage company or -- or rental agency that was supposed to take care of all of the bills, any repairs, and he also was in charge of renting the properties, and so we were just simply supposed to be like backers or bankers, you might say.

*    *    *

[Herter] always told [her and her parents] that he didn't have good enough credit, that it wasn't enough for him to be able to make the transactions. He had a goal in mind and he shared with us that he wanted [one hundred] houses, and so that was his goal. Even though we felt that that was too many for him to handle, he assured us that he could handle that, and so we went along with it, thinking that he was doing well. We had no idea.

(Betty Loera Dep. at 15, 19.)  She knew she was signing loan documents but, as far as she was concerned, Herter was responsible for payment.  At one point, Ms. Loera, who had attended some college, thought he might be in over his head and offered to help him.

Following the default on the loans, the Bank initiated this lawsuit against Herter and CM as well as the Powells and Mr. Loera.  Shortly thereafter, the Powells and Loeras sought bankruptcy protection.  Betty Loera testified that her husband and her parents were dropped as defendants in the instant lawsuit because the "bankruptcy could not be discharged unless [they] cooperated with BancorpSouth, that the lawsuit would not be discharged from [their] bankruptcy unless [they] agreed to be cooperative at any and every time that [they] were asked."  (Betty Loera Dep. at 48.)

Betty Cochran is vice president of BancorpSouth and had been with the bank for twenty-four years.  During the time period relevant to this action, she worked in the operations management section of the mortgage division, which encompassed the areas of underwriting, closing and post-closing issues.  With respect to the subject loans41, she testified at trial that:

> [t]he loans that are in question here are investment properties, which means they were not owner occupied.  And that per se met agency guidelines, but when these loans started going to default, we take the loans, look at them and see, you know, just to see what's there.  And as we begin to pull loan files and start to do research of the properties, you start seeing different names and you had signatures that appeared to be the same with different names but the same type of signature and just a lot of inconsistencies that you typically would not appear to be -- If you looked at one loan file, you wouldn't think anything about it, but then you looked at another one and another one and another one, and so you saw a story start to come out of these loan files.

(Trial transcript ("Tr.") at 8-9.)  According to Cochran, the Bank did not begin pulling its files on the defaulted loans in this case until 2004, even though the files went back several years prior to that time.  An investigation into the contents of the loan files revealed numerous leases which Cochran considered to be suspect.

The Bank's loan files were typically started by an originator, whom Cochran identified in this case as Amy Harwell.  The loan would advance to the processor, Stephanie Tidwell, and then to a closer who sent out the closing documents.[1]  The loan would at that point move to the post-closing department where the loan file would be assembled.  The file would then be delivered to the Bank's vault for storage.  Loan applications, Cochran explained, were created by the Bank based on information provided by the applicant.  She gave the following testimony concerning verification of the information contained in such applications:

> Q:    And I'm assuming BancorpSouth at that time had measures in place to verify the information?
>
> A:    Yes.
>
> Q:    So to your knowledge BancorpSouth would have verified the information in each and every one of those loan applications, correct?
>
> A:    Would have verified the information that appeared to be pertinent at the time, yes.
>
> Q:    Well, did they verify it or didn't they verify it?
>
> A:    I would say we would probably do a better job now than we did four or five years ago.
>
> Q:    Do you know if any of the information was verified by BancorpSouth?
>
> A:    I know there was some documentation like the names and the leases that was blank.  We would not accept that today.  We shouldn't have accepted it several years ago, but when an applicant comes in, you don't go in to -- you think you are provided good information, so you don't -- so at that time that processor did not take the magnifying glass and look at those documents.
>
> Q:    And the processor you are talking about is Ms. Tidwell?
>
> A:    Yes.

---

[1]The testimony of neither Harwell nor Tidwell was offered by BancorpSouth at trial.

8

Q:     She did all these?

A:     Yes.

Q:     Have you talked to Ms. Tidwell about this?

A:     I have not personally, no.

Q:     You completed this investigation, I believe as you called it, and you never talked to the original processor of all these loans?

A:     I did not talk to her.  We had management that did.  I looked at the documents in the file.  I do a file analysis looking at documents.

Q:     Well, you don't think that's kind of unusual that you have the same originator and processor on all these loans?

A:     Not really.  We have loan officers and originators that do numbers of loans, so it's not unusual that you would have a number of loans from one particular loan officer or processor.

Q:     So basically what happened with the Powells and Mr. Loera is not unusual, is it, to have all these loans?

A:     It's not unusual to have a number of loans to one person, no.

Q:     Okay.  So there is nothing unusual about having this many loans with BancorpSouth for investment properties?

A:     No.

Q:     And you would agree with me that there would have been nothing preventing BancorpSouth from verifying any of the information in these loan applications, would they?

A:     Not if we had -- if she thought there was something suspect.  But you don't expect for a customer to bring you in documents that are not, that are suspect.

Q:     So BancorpSouth only verifies the loan applications if they are suspect?

A:     You don't anticipate an applicant bringing in documentation that is suspect, no, because you are dealing with that customer so you are thinking they are bringing you in documentation that is complete and valid.  I would say we would have done a better job today than we did four or five years ago.

9

Q:      All right.  So you would agree that there would be BancorpSouth, if they chose to or if they wanted to, could have verified every single bit of information in any of these loan applications at the time?

A:      Yes, they could have.

Q:      And they may or may not have done that?

A:      That's correct.

Q:      All right.  And they funded the loan anyway?

A:      Yes.

Q:      Are you aware or is there anything reflected in the file in regard to these leases, as your file reflects, whether it's names, blanks and that type thing, all these concerns that you have in looking at the files, is there anything in the file indicating that that information wasn't acceptable at the time before the loan was approved?

A:      No.

Q:      All right.  And I'm assuming then if those were in the files at the time and there is not any lessees listed on these bank leases, BancorpSouth approved the loan anyway, correct?

A:      We did.

Q:      Does BancorpSouth make it a regular habit to approve of these types of documentation inconsistencies I believe was the term you used?

A:      I hope not.

                        *        *        *

Q:      Okay.  So at the time all these loans were opened, applied for and approved by BancorpSouth, they did meet your guidelines at least as of that time, correct?

A:      That's correct.

Q:      And I certainly realize the mortgage industry has changed since that time; is that correct?

10

A: That's correct.

(Tr. at 108-12.)

Justin Herter described his relationship with BancorpSouth thusly:

A: I was set up to basically find the properties, negotiate contracts on offers with the different FHA or whatever foreclosures to line up the financing to initially purchase the property and rehab it, which we did through BancorpSouth.

Q: Well, how did that work through BancorpSouth, to your knowledge?

A: I had a commercial line of credit.  Debbie Hollowell was my representative at the bank.  And it started off as a lesser amount and was increased as our relationship grew.

I signed as a personal guarantor guaranteeing all the commercial loans.  And basically, when the property was rehabbed so it would have a clear appraisal and not be subject to repair conditions, we were able to transfer it over to permanent financing, which as I mentioned earlier, she wanted as much of that to go through the bank's business as possible.

So that's what we did with each borrower as long, as we were using BancorpSouth on the first part of the financing.  We would always try to use them to take out the mortgage through Robert and then Sylvestre and the borrowers that we used.

*  *  *

Q: Now, in terms of the permanent financing, would you personally or [CM] be involved or sign any documents to obligate themselves for the permanent financing?

A: No.  The only documents I signed was as power of attorney for Robert . . .

*  *  *

Q: Did you tell them everything that you were doing?

A: Not only them, the closing attorney -- everybody involved in the transaction was aware of the corporation, how it was set up, who were the closing attorneys, the one that would help do corporate things that needed to be done as far as the minute book and things like that.  So they were all aware of the

family relationship, of my involvement and how everything was structured.

(Tr. at 372-74.)  Bank officers, he recalled, received documents from Powell and Mr. Loera by fax.

(Tr. at 391-92.)  He denied making any negligent representations to BancorpSouth personnel,

attempting to defraud the Bank, or providing it with false information.  Indeed, he testified that he

had similar relationships with numerous other lenders.  (Tr. at 374-77, 394.)  Herter was aware of

nothing that would have prevented BancorpSouth from obtaining any documents from him or his

relatives that they desired.  (Tr. at 392.)  Nor did the Bank ever challenge his or CM's corporate

status.  (Tr. at 396.)

As for CM, Herter related that the corporate entity was formed in 2000 to purchase and

rehabilitate foreclosed houses and then rent or sell them as income-earning properties for investors.

At one point the company owned around 160 homes.  He described CM as the management

company for properties ostensibly owned by the Powells and Loeras.  Rents would be paid into CM's

corporate bank account and payments on the BancorpSouth loans would be automatically debited

therefrom.

According to Phillip Carpenter, who serviced mortgage loans at BancorpSouth, the Powells

and Loera were not pursued in bankruptcy court because it was determined they had no assets to go

against.  (Tr. at 513.)  On the other hand, Bank officials believed funds might be obtained from the

Defendants.  (Tr. at 513.)  Carpenter acknowledged that the servicing files contained no documents

in which Herter obligated himself to BancorpSouth personally.  (Tr. at 514.)  Rather, the loans were

made to the Powells or Loera, and shortly thereafter assigned to Fannie Mae, although the Bank

retained servicing rights thereon.  (Tr. at 515-16.)

## CONCLUSIONS OF LAW

12

In this action, the Plaintiff seeks to reform the loan contracts at issue to substitute Herter and CM as the true borrowers and alter egos of his "elderly and/or uneducated relatives," who it claims were mere straw borrowers. In the alternative, the Bank contends that the Defendants conspired with Herter's relatives and that the Defendants are liable under a theory of negligent misrepresentation and/or that it is entitled to recover on equitable grounds including quantum meruit. Furthermore, the Plaintiff seeks an imposition of sanctions against the Defendants for willful destruction of evidence.

Disposition of Substantive Claims.

*Reformation of Loan Contracts.*

Courts are not to "relieve parties from contractual obligations simply because they later prove to be burdensome or unwise." Sikora v. Vanderploeg, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006), *app. denied* (Dec. 27, 2006); *see also* 28 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 70:209, at 232 (4th ed. 2003) ("Courts are not in the business of rewriting contracts to bail out parties who have failed to prudently construct their business transactions"). However, "[p]ursuant to Tennessee law, a court in equity, under certain conditions, will reform an instrument . . . when it fails to reflect the true intent of the parties. The error in the instrument must have occurred because of the mutual mistake of the parties or because of one party's mistake induced by the other party's fraud." Holiday Hospitality Franchising, Inc. v. States Res., Inc., 232 S.W.3d 41, 51 (Tenn. Ct. App. 2006), *reh'g of denial of app. denied* (May 29, 2007); *see also* Rolane Sportswear, Inc. v. U.S. Fidelity & Guar. Co., 407 F.2d 1091, 1096 (6th Cir. 1969); Pittsburg Lumber Co. v. Shell, 189 S.W. 879, 880 (Tenn. 1916); McMillin v. Great S. Corp., 480 S.W.2d 152, 155 (Tenn. Ct. App. 1972). Unilateral mistake may also justify reformation where there has been

inequitable conduct or a material misrepresentation.  *See* <u>In re Rudd</u>, 28 B.R. 591, 594 (Tenn. 1983)

(unilateral mistake induced by fraud or inequitable conduct grounds for reformation of contract in

Tennessee); <u>Clayton v. Brisendine</u>, No. 5, 1990 WL 140910, at *5 (Tenn. Ct. App. Oct. 1, 1990)

("Equity has the power to reform written instruments . . . where there has been a unilateral mistake

accompanied by fraud or other inequitable conduct").  Reformation is appropriate in "protect[ing]

an innocent party[,] especially where there is ignorance or a mistake on one side and fraud or

inequitable conduct on the other, as where one party to an instrument has made a mistake and the

other knows it and fails to inform him of the mistake or conceals the truth from him." <u>In re Rudd</u>,

28 B.R. at 594.  The mistake or fraud must be demonstrated by "clear, cogent, convincing evidence."

<u>Lane v. Spriggs</u>, 71 S.W.3d 286, 289-90 (Tenn. Ct. App. 2001)*, app. denied* (Apr. 8, 2002).

        The Plaintiff argues for reformation on the grounds of unilateral mistake.  Although there

is no allegation of fraud before the Court, the Bank points to Herter's submission of loan applications

that appeared facially regular but failed to reflect that he was in fact the true borrower.  However,

even assuming he was the "true borrower," the evidence clearly indicates that equitable relief in the

form of reformation of the loan contracts is not appropriate here.  The Bank is in the business of

making decisions on whether to accept the risks involved in making investment loans.  The loans

were all made to the Powells or Loera and the loan documents signed by these individuals or by

Herter as their attorney-in-fact.   There is no indication that anyone from the Bank ever

communicated with the Powells or Loera directly or attempted to do so.  Moreover, there was

nothing preventing a more thorough investigation by the Bank into the relationships among the

Powells, Loera, Herter and CM with respect to the properties for which the loans were made and,

therefore, no reason for it to rely on any representation that may have been made by Herter.  Finally,

14

while the Plaintiff argues that, based upon Betty Cochran's testimony, the loans would not have been made on Herter's own inadequate credit history, a review of her testimony reveals nothing whatever regarding the credit history of the individual Defendant or that he ever attempted to obtain loans on his own behalf. Thus, the Court declines the Bank's invitation to reform the contracts. *See* Ballin v. Bechtel, C. A. No. 247, 1975 WL 182677, at *4 (Ohio App. 6 Dist. Nov. 21, 1975), *recons. denied* (C. A. No. 247, 1976 WL 190632 (Ohio App. 6 Dist. Jan. 9, 1976)) (reformation of contract not warranted where parties seeking reformation based on unilateral mistake could have conducted a full investigation, had no reason to rely on representations and were represented by competent counsel).

Based on the Court's denial of the Plaintiff's request for reformation, it at this point considers the Bank's alternative arguments.

### *Negligent Misrepresentation.*

In Tennessee,

[l]iability for negligent misrepresentation will result, if defendant is acting in course of his business, profession, or employment, or in transaction in which he has a pecuniary interest, and defendant supplies faulty information meant to guide others in their business transactions, defendant fails to exercise reasonable care in obtaining and communicating information, and plaintiff justifiably relies upon information. In order to prevail in a suit for negligent misrepresentation, the plaintiff[] must establish by a preponderance of the evidence that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiff[] justifiably relied on the information.

Ingram v. Cendeant Mobility Fin. Corp., 215 S.W.3d 367, 371 (Tenn. Ct. App. 2006) (citation omitted).

The Plaintiff identifies the negligent misrepresentation as Herter's assurance to its loan officers was that his relatives intended to repay the loans issued on their credit when neither they

nor he ever intended that the relatives would repay the loans.[2]  Even if the other elements of negligent misrepresentation have been met, BancorpSouth has failed, for the same reasons articulated in the preceding section, to establish by a preponderance of the evidence that it justifiably relied on any statements Herter may have made that the Powells and Loera intended to repay the loans.  As a result, the Plaintiff's negligence misrepresentation claim cannot succeed.  *See* Capital Mgmt. Partners v. Eggleston, No. W2004-01207-COA-R3-CV, 2005 WL 1606066, at *12 (Tenn. Ct. App. Jul. 7, 2005) (in finding plaintiff private investment firm could not prove its claim of negligent misrepresentation, the court noted that it failed to take reasonable care on its own to investigate despite having ample time to do so).

*Civil Conspiracy.*

Under Tennessee law, a "civil conspiracy" is "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means."  Dale v. Thomas H. Temple Co., 208 S.W.2d 344, 353 (Tenn. 1948); *see also* Baldwin v. Pirelli Armstrong Tire Corp., 927 F. Supp. 1046, 1053-54 (M.D. Tenn. 1996) (same).  Civil conspiracy also "requires an underlying predicate tort allegedly committed pursuant to the conspiracy."  Hauck Mfg. Co. v. Astec Indus., Inc., 375 F. Supp. 2d 649, 660 (E.D. Tenn. 2004).  "[I]t is a basic principle that each conspirator is responsible for everything done by his confederate which the execution of the common design makes probable as a consequence; in other words, each conspirator is liable for the damage caused by the other."  Brown v. Birman Managed Care, Inc., 42

---

[2]The Court notes that the alleged misrepresentations referred to by the Bank sound more in fraud than negligence.  The Plaintiff's fraud claims have, however, been dismissed.  (*See* Order Denying Pl.'s Mot. to Strike & Granting Defs.' Mot. to Dismiss Claims of Fraud, Docket Entry ("D.E.") 86.)

S.W.3d 62, 67 (Tenn. 2001) (quoting Dale, 208 S.W.2d at 354) (internal quotation marks omitted).

> Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors.

Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC, 461 F. Supp. 2d 629, 642-43 (M. D. Tenn. 2006) (quoting Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 457 (Cal. 1994)).

It is the position of the Bank that Herter combined with his family members to enter into a scheme to borrow funds for homes actually purchased by him when he was unable on his own to qualify for the necessary credit. It contends that, while not in itself unlawful, nondisclosure of the true borrower and purchasers of the rental property for which the loans were obtained constituted an unlawful purpose and resulted in loss to the Plaintiff. However, in this case, there is no underlying predicate tort allegedly committed pursuant to the conspiracy. Thus, the claim cannot stand.[3] _See_ Hauck Mfg. Co., 375 F. Supp. 2d at 660, _supra_.

_Quantum Meruit._

The Plaintiff also urges the Court to apply the equitable doctrine of quantum meruit in its favor. As the Defendants submit, this claim was not included in the amended pretrial order entered on February 27, 2007. While it concedes the Defendants' assertion is correct, the Bank points out that the claim was specifically referred to in its trial memorandum filed a few days before, on February 24.

Quantum meruit claims "are equitable substitutes for contract claims." Castelli v. Lien, 910

---

[3]Based on the Court's conclusion, it need not reach the Defendants' assertion that, if there was a conspiracy, the Plaintiff was a participant.

S.W.2d 420, 427 (Tenn. Ct. App. 1995), *app. denied* (Nov. 6, 1995).  "Quantum meruit, 'as much

as he deserves,' is . . . based upon the concept that no one should be unjustly enriched by taking the

benefits of another's labor, services or material without paying a reasonable amount for them."  In

re Liberty Fibers Corp., No. 05-53874, 2009 WL 414675, at *6 (E.D. Tenn. Jan. 23, 2009) (quoting

Hall & Waller & Assocs. Architects, Inc. v. Lambuth Coll., No. 02A01-9109CH00196, 1992 WL

252510, at *5 (Tenn. Ct. App. Oct. 6, 1992)).  "Recovery under this theory is not based on the

intention of the parties; rather it is an obligation created by law and founded on the principle that

a party receiving a benefit desired by him, under circumstances rendering it inequitable to retain it

without making compensation, must do so."  Id; at *7 (citation and internal quotation marks

omitted); *see also* Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn. 1966).

> A party seeking to recover on a quantum meruit action is entitled to recover the reasonable value of services performed when the following circumstances exist:
>
> (1)      there must be no existing, enforceable contract between the parties covering the same subject matter,
>
> (2)      the party seeking recovery must prove that it provided valuable goods and services,
>
> (3)      the party to be charged must have received the goods and services,
>
> (4)      the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
>
> (5)      the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

CPB Mgmt, Inc. v. Everly, 939 S.W.2d 78, 81 (Tenn. Ct. App. 1996), *app. denied* (Jan. 6, 1997)

(internal citations omitted).  As the Tennessee Supreme Court recognized in Paschall's, the "most

significant requirement for a recovery on quasi contract is that the enrichment to the defendant be

unjust. . . . Also, we think that before recovery can be had . . ., [the plaintiff] must have exhausted [its] remedies against the person with whom [it] contracted, and still has not received the reasonable value of [its] services." Paschall's, 407 S.W.2d at 57-58. "Liability under quantum meruit is based on a legally implied promise to pay a reasonable amount for goods or services received." Castelli, 910 S.W.2d at 427.

Clearly, there is no existing contract between the Defendants on their own behalf and the Bank. Secondly, BancorpSouth provided services in the form of loans. However, the Plaintiff has failed to establish the third element of the quantum meruit claim. That is, it has made no showing that Herter and/or CM *received* the goods and services, as the evidence reflects that the loan funds were disbursed to the Powells and Loera for the purchase of properties in their names. In addition, the Bank's abandonment of the pursuit of its remedies against the named borrowers with whom it contracted weighs against its recovery under the equitable doctrine of quantum meruit. *See* Paschall's, *supra*; McDaniel v. McCall, 655 S.W.2d 155, 157 (Tenn. Ct. App. 1983) (quantum meruit recovery unwarranted where plaintiff offered no evidence that he had exhausted his remedies against party with whom he had contracted). Moreover, some courts in this Circuit have considered the plaintiff's responsibility for its own detrimental position in denying a quantum meruit claim. *See* Gaymar Indus., Inc. v. FirstMerit Bank, N.A., 311 F.App'x 814, 816 (6th Cir. 2009) (applying Ohio law, the court noted that "in determining whether a defendant received an unjust or unconscionable benefit, we must consider whether the defendant was the party responsible for the plaintiff's detrimental position," citing Andersons, Inc. v. Consol, Inc., 348 F.3d 496, 502 (6th Cir. 2003)). Here, the Court has rejected the Plaintiff's claims that Herter or CM are in any way responsible for its loss. Based on the Bank's failure to establish the elements of the quantum meruit claim, it is

19

dismissed.  *See* <u>Educ. Res. Inst. v. Moss</u>, No. M2005-02378-COA-R3-CV, 2006 WL 2080382, at *3 (Tenn. Ct. App. Jul. 26, 2006) (a party alleging quantum meruit must prove all five of the elements thereof).

For the reasons set forth herein, the Court finds in favor of the Defendants.[4]  In doing so, the Court emphasizes that the loans were made not to Herter but to the Powells and Loera, who the evidence reveals were competent to enter into the transactions and were basically aware of and acquiescent in the activities of Justin Herter.  Simply put, they wanted to make money and were willing, wisely or not, to place their trust in Herter to achieve that purpose.  Although the Bank now bemoans the laxity of its procedures in making the loans, there is no evidence to suggest BancorpSouth officials had any misgivings whatever about any of the parties at the time the loans were made.  Nor did the Bank harbor misgivings thereafter, until the loans went into default, at which point it sued everyone in sight.  Bank officer Carpenter conceded in his testimony at trial that, after they declared bankruptcy and were dismissed from this suit, the Powells and Loera were not pursued because the Bank determined there were no assets to be obtained from them.  Rather, he acknowledged that the decision was made to pursue Herter and CM instead, not because the Bank held documents obligating either to repay the loans but because they might have funds which BancorpSouth could recover through litigation.  Had the Plaintiff maintained its suit against the Powells and Loera, it might have prevailed.  As it is, the Bank moved forward in this case against,

---

[4]Based on the Court's conclusion that neither Herter nor CM are liable to the Bank, it need not address the Plaintiff's extensive arguments concerning piercing the corporate veil, as the question of whether Herter attempted to hide behind the veil to avoid alleged liability to the Bank has been rendered moot.

in this Court's opinion, the wrong defendants.[5]

Spoliation of Evidence.

As noted above, the Plaintiff seeks sanctions in this case for spoliation of evidence jointly and severally against Herter and his alter ego, CM, in the form of a directed verdict or an adverse inference.[6]  This lawsuit was filed and served on Herter in June 2004.  It appears CM was doing business until at least August 2004 as evidenced by a deed generated at Herter's direction transferring property from Robert Powell to CM on August 10, 2004.  In September 2004, Herter filed initial disclosures in this lawsuit pursuant to Fed. R. Civ. P. 26, in which he stated that "nearly all of these documents are already in the possession of [the Plaintiff]" when, in fact, no documents were provided to the Bank.  During discovery, Herter failed to produce a single document related to CM, himself, or the subject properties despite two motions to compel and orders to compel production of documents in response to discovery requests propounded by the Plaintiff.  In a response filed August 23, 2006 to the Bank's first motion to compel, Herter stated that "all of the documents are outside of his possession and control and/or in possession of the businesses which

_____

[5]The Bank has attempted to impose liability on Herter on the grounds that he acted as the alter ego of the Powells and Loera.  This assertion is based on Herter's instructions to his relatives to execute certain documents, his control of their involvement in the transactions, and his substitution of their names as his "second self" in order to obtain credit he would not have been entitled to on his own.  However, in the recent decision of Hindmon v. Jones, No. E2007-00670-COA-R3-CV, 2008 WL 2557373, at *1-5 (Tenn. Ct. App. Jun. 27, 2008), the defendants urged the Tennessee Court of Appeals to determine that the plaintiff, an estate, acted as the alter ego of an individual beneficiary.  The court declined to do so, finding there was no Tennessee authority to support extension of the alter ego concept to entities other than corporations.

[6]"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citing Black's Law Dictionary 1401 (6th ed.1990)).

have been dissolved or no longer exist. . . . Defendant Herter would remind this Court that he had very little involvement in the transactions between the other Defendants and the Plaintiff and, as such, has very scant records regarding these transactions." In his August 2006 deposition and again at trial, he averred that CM's corporate records were retained and maintained by closing attorneys for various banks.

At trial, Herter further testified that he did not possess the records for CM and documents relating to the instant loans except for what might be contained in a "couple of boxes," the contents of which he was uncertain. The boxes were not produced in discovery and not identified by Herter until trial. He recalled that a secretary, who stopped working for him before CM was dissolved and moved out of state, kept up with business records on an old computer. Herter did not know where the files contained on the computer were at the time of trial. Herter also denied possessing bank records reflecting when CM's accounts were closed. Although CM used computer generated checks, Herter was unaware of the location of those computer checks or records relating thereto. Nor did he know the whereabouts of CM's tax returns. Herter specifically denied destroying his or CM's records. However, Melanie Herter, the individual Defendant's ex-wife, offered testimony at trial that, after suit had been filed in this case, she witnessed Herter destroying CM records by removing them from a filing cabinet in their home and placing them in garbage bags. When she questioned him about it, he responded that the company was closed and he no longer needed them.

Based on the testimony, the Court articulated at the conclusion of the trial that there was "no question . . . that [Herter] did away with these documents" and that spoliation of evidence had occurred. The Court reserved, however, the question of what sanction should be imposed as a result of the spoliation.

Spoliation of evidence issues in federal court are governed by federal law, as "the authority to impose sanctions for spoliated evidence arises . . . from a court's inherent power to control the judicial process" and because "a spoliation ruling is evidentiary in nature and federal courts generally apply their own evidentiary rules in both federal question and diversity matters." Adkins v. Wolever, 554 F.3d 650, 652 (6th Cir. 2009) (en banc) (internal citations and quotation marks omitted).[7]  Spoliation sanctions, the crafting of which lie in the broad discretion of the trial court, "should serve both fairness and punitive functions." Id. "Because failures to produce relevant evidence fall along a continuum of fault -- ranging from innocence through the degrees of negligence to intentionality,  the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault." Id. at 652-53 (internal citation omitted).  Thus, a district court may impose various different kinds of sanctions for spoliated evidence, including dismissing a case, granting judgment to a prejudiced party, or, as factfinder, inferring a fact based on lost or destroyed evidence.  Id. at 652-53; see also Kounelis v. Sherrer, 529 F. Supp. 2d 503, 520 (D.N.J. 2008).  A spoliation sanction should be "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine" and "designed to:  (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." West, 167 F.3d at 779.

A grant of judgment in favor of a prejudiced party is appropriate only "if there is a showing

---

[7]Adkins overruled the previous law in this Circuit, as recognized in Beck v. Haik, 377 F.3d 624, 641 (6th Cir. 2004), that "[t]he rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law[.]" Adkins, 554 F.3d at 651.  Therefore, the Tennessee state cases cited to by the parties in their post-trial briefs are not applicable.

of willfulness, bad faith, or fault on the part of the sanctioned party" and, as it is a "drastic remedy," "should be imposed only in extreme circumstances." Id. (citations omitted).  "Bad faith" for these purposes means "destruction for the purpose of hiding adverse information." In re Kmart Corp., 371 B.R. 823, 841 (N.D. Ill. 2007) (citing Diersen v. Walker, No. 00 C 2437, 2003 WL 21317276, at *3 (N.D. Ill. Jun. 6, 2003)).  "Fault" in this context "suggests objectively unreasonable behavior." Id. (quoting Long v. Steepro, 213 F.3d 983, 987 (7th Cir. 2000)).   In determining whether the extreme sanction is warranted, a court should consider "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).  While spoliation clearly occurred in this case, the Court is unwilling to impose the extreme sanction of a directed verdict in the Plaintiff's favor, particularly in light of its conclusion that the Defendants bear no liability.

As an alternative to directed verdict, the Plaintiff requests that the Court at a minimum impose the sanction of negative inference to the effect that Herter acted in the course of his business in transactions in which he had a pecuniary interest when he used his family members to purchase properties for his own benefit.

> An adverse inference for spoliation of evidence, or a spoliation inference, permits a [factfinder] to infer that destroyed evidence might or would have been unfavorable to the position of the offending party.  The spoliation inference is a permissive inference that is predicated on the common sense observation that when a party to an adversarial proceeding destroys relevant evidence it is likely done out of fear that the evidence would be harmful to that party.  Because of the implication that the destroyed evidence would harm the destroying party, the spoliation inference serves the remedial function of leveling the playing field after a party has destroyed or withheld relevant evidence.  As such, the spoliation inference can be seen as primarily remedial in nature, as opposed to punitive.

24

Kounelis, 529 F. Supp. 2d at 520 (internal citations and quotation marks omitted).

According to the Bank, a negative inference is supported by evidence that Herter received large monthly rental checks payable to him individually, that CM rather than his relatives took advantage of income and mortgage deductions applicable to owners of real property, and that Herter maintained total control over the acquisition and transfer of the purchased properties.  BancorpSouth argues that, because of the spoliation of evidence, no documentation exists to demonstrate that Herter had insufficient credit to obtain the loans in his own name.

In a post-Adkins decision, a district court in this Circuit determined, in Forest Laboratories, Inc. v. Caraco Pharmaceutical Laboratories, Ltd., No. 06-CV-13143, 2009 WL 998402 (E.D. Mich. Apr. 14, 2009), that

> a party seeking an adverse inference . . . based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

Forest Labs, 2009 WL 998402, at *1 (quoting Residential Funding Corp. v. Degeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)).  Also, it must have been reasonably foreseeable to the spoliating party that the evidence would be subject to discovery.  Kounelis, 529 F. Supp. 2d at 520.  The burden of demonstrating the existence of each element rests with the party seeking to use the spoliated evidence.  Forest Labs, 2009 WL 998402, at *1.  That said, a party is not necessarily entitled to an adverse inference simply on the basis of a finding that all of the elements of the adverse inference have been met.  Kounelis, 529 F. Supp. 2d at 520.  "There is no rule of law mandating a particular sanction upon a finding of improper destruction or loss of evidence; rather, such a decision is left to the discretion of the court.  Thus, [the trial court] may, despite a finding that

25

all of the elements entitling a party to an adverse inference have been met, exercise [its] discretion and decide not to grant a request for an adverse inference." Id. at 520-21 (internal citations and quotation marks omitted).

The Court will address each element seriatim. With respect to the first criterion, "[i]t goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it." Forest Labs, 2009 WL 998402, at *2 (citing Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Id. (citing Silvestri v. Gen. Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001); Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)). In this case, as the Court noted at trial, Herter indeed destroyed documents which he should have known might be relevant to the litigation after he became aware of the Bank's legal action on the loans.

Next, the Plaintiff must show a culpable state of mind on Herter's part. "Once the duty to preserve attaches, any destruction of evidence is, at a minimum, negligent." Id. at *5 (quoting Zubulake, 220 F.R.D. at 220). "Therefore, the three possible states of mind that satisfy the culpability requirement are [1] bad faith destruction, [2] gross negligence, and [3] ordinary negligence." Id. (quoting Sampson v. City of Cambridge, Md., 251 F.R.D. 172, 179 (D. Md. 2008)). With respect to ordinary negligence, "[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." Id. (quoting Residential Funding, 306 F.3d at 108). As Judge Friedman explained in Forest Labs,

> [t]he sanction of an adverse inference should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the

26

> inference.  It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently.  The adverse inference provides the necessary mechanism for restoring the evidentiary balance.  The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.

Id. at *5-6 (quoting Residential Funding, 306 F.3d at 108).  Therefore, although a finding a bad faith or intentional misconduct is not necessary, the more culpable the state of mind, the easier it is for the party seeking the spoliation sanction to establish the third element -- relevance.  Id. at *6.  Here, there is no question in the Court's mind that Herter's actions were more than negligent.

Finally, the Plaintiff must "produce some evidence suggesting that a document or documents relevant to substantiating [its] claim would have been included among the destroyed files."  Id. (citation and internal quotation marks omitted).  For purposes of this element, "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction."  Id. (citing Residential Funding, 306 F.3d at 108-09) (citation and internal quotation marks omitted).  This BancorpSouth has failed to establish.  The Plaintiff has vigorously contended that the destroyed documents showed CM was a sham corporation relevant to its assertion in this case that the corporate veil should be pierced.  However, the corporate status of CM is not relevant to the outcome of the lawsuit based on the Court's finding that neither Herter nor CM were liable for the Bank's losses in the first instance.  In addition, while the Plaintiff in conclusory fashion maintains that the destroyed documents may have established Herter actually received the benefit of the loans, it has offered no evidence to support its claim.  Therefore, the Plaintiff's request for an adverse inference is denied.

Nonetheless, Herter's actions without question warrant sanctions in some form.  Accordingly,

the Court hereby imposes a monetary sanction in the amount of $5,000.00, to be paid by Justin

Herter to the Plaintiff within thirty days of the entry of this order.

     IT IS SO ORDERED this 5th day of June, 2009.

                       s/ J. DANIEL BREEN
                       UNITED STATES DISTRICT JUDGE